### REVELS v. REVELS.

FRAUD—UNDUE INFLUENCE—MISREPRESENTATION—CONTRACT—MENTAL CAPACITY—CONSIDERATION OF DEED.—DEED from mother to son held not to have been obtained by fraud, undue influence or misrepresentation, but to have been freely and willingly executed; that mother was of sufficient mental capacity to understand the transaction; but son required to execute to mother a deed binding himself to support her at his home, because that was part of consideration of deed not inserted.

Before GARY, J., Chester, December, 1901.     Reversed.

Action by Susannah Revels against Jefferson D. Revels and J. L. Abell. The following is the report of the special referee, Mr. J. H. Marion:

"This is an action for the cancellation of certain deeds of conveyance executed by the plaintiff herein to the defendant, Jefferson D. Revels. The action seeks the setting aside of said deeds upon the general grounds of plaintiff's incompetency, undue influence and fraud, either actual or constructive, growing out of the circumstances connected with the transactions in question.

"The plaintiff, Susannah Revels, and the defendant, Jefferson D. Revels, are mother and son. As a preface to the story of domestic infelicities—forming, in good measure, the subject matter, as well as the *raison d'etre,* of this suit—the family history of the Revels, from the year 1874, will be briefly sketched. In that year, one George Revels, a man of humble social station but of thrifty bent and fair mental capacity, was living with his wife, Susannah, and several small children upon a homestead which embraced the land involved in this action. Twelve children had been born into the Rev-

els home, several of whom at this time had grown up and had gone out into the world for themselves. For one in his condition of life George Revels had accumulated a competency. He had a farm of some 300 acres, near what is now the village of Lowryville, in said county and State, and was, it is fair to assume, making a comfortable living for himself and his family. But the standard of living in the Revels home was not high—not higher certainly than the most ordinary physical needs and wants made it. No attention, seemingly, was paid to education or to the culture of mental or spiritual things. Some of the children learned to read and write, some did not, and all that appeared as witnesses in this action gave unmistakable evidences of having 'sat long in darkness.' Some time in this year of 1874, George Revels died, leaving his widow, Susannah, the plaintiff herein, and five minor children living in the old home. Among the children were Jefferson Davis, the defendant herein, and Mary S. (now Mrs. George Roof) and Georgiana (now Mrs. Melton). The mother then was about fifty years of age, Jefferson Davis was a mere plough boy and his two sisters above mentioned were younger. George Revels' estate consisted of some 300 acres of land and some personalty. A suit for partition was brought. In the distribution the widow received as her share the old homeseat, with 96 1-2 acres of land, being the identical tract of land involved in this action. The minor children received, by their guardian, in the neighborhood of $100 each. From this year of 1874, then, the plaintiff continued to live on at the old place, with her several daughters and her one son, Jefferson, the defendant. The marriage of two of the older girls soon reduced the members of the household to the old lady, Georgiana, Mary and Jeff. As thus constituted, the household continued for several years—Jeff running the farm and the women attending to the domestic affairs. In 1884, Mary, the youngest girl, married one George Roof. Six years later, Jeff, then a little over thirty years of age, married, and brought his wife home to live with his mother and his sister, Georgiana. Jeff's

17—64

matrimonial venture seems to have met with the disapproval of his mother and, more particularly, of his sister—to both of whom the new wife was, to a considerable extent, *persona non grata.* Domestic relations becoming somewhat strained, Jeff and his wife moved away for a few months, but came back within a year and moved into a house which Jeff built for a home within a few hundred yards of his mother's, on the old place. In 1892, Georgiana, the only child of the plaintiff then living with her, married Mike Melton and moved away from the old home. Shortly thereafter, Jeff and his family moved back into the old home to live with the old lady. The marriage of Georgiana to Mike Melton (a bridegroom of some sixty-odd summers) was a rise in the world, from a financial standpoint—which fact seems to have been promptly recognized by Georgiana's mother, the plaintiff herein, who very shortly after Mike's advent into her family induced him to take up a mortgage on her son Wesley's land, and, also, a mortgage upon her own land, then held by Mrs. Mary Gaston, of Chester. The current of family history now runs smoothly for something over two years, until the fall of 1895. In the late summer or early fall of this year, Mike Melton made known his intention of fore-closing his mortgage upon Wesley's land. The announcement seems to have caused something of a disturbance in the family circle and to have aroused, to a marked degree, the fears and resentment of the old lady. Wesley's land was duly sold under foreclosure proceedings by the thrifty and undaunted Mike. Apparently growing out of said circumstances, very shortly thereafter, the old lady, the plaintiff herein, deeded her land upon which Mike Melton held mortgage, to her son Jeff, who arranged to take up mortgage in Melton's hands and place the mortgage debt, the payment of which he assumed, with the defendant, Abell. The conveyance from the old lady, the plaintiff, to her son Jeff, by the deed aforesaid, is the principal transaction, the validity of which is questioned in this action. Nearly two years after the execution of the first deed, in August, 1897, a second

deed from the plaintiff to her son Jeff, conveying the same land, was executed. In this second deed the consideration is not the same as in the first deed. The old lady appears to have lived on at the old place with Jeff continually until early in January, 1900, when she came to Chester to visit her daughter, Mary Roof; while there, in the winter and spring of 1900, she had a severe spell of sickness. Going back to Jeff's in May, 1900, she came back to Mary Roof's in the fall of 1900, where she was in January, 1901, when this suit was brought. Such is an outline of the Revels' domestic history from 1874 to the 1st of January, 1901.

"The broad issue of law and fact before us is as to the validity of the deed of Susannah Revels to Jefferson D. Revels, of date the 23d of December, 1895, purporting to convey the premises described in the complaint. Was this instrument the outgrowth of, or attended by, such facts and circumstances as will warrant a court of equity in declaring it null and void?

"1. In determining that question, the first issue of fact raised by the pleadings and by the testimony is as to the mental capacity of the plaintiff, Susannah Revels, on the said 23d day of December, 1895. There can be no difference of opinion as to the plaintiff's mental condition at the time she appeared as a witness at the hearing before me on the 15th of May, 1901. She presented the appearance of a very old and exceedingly feeble woman. She would grow impatient, refuse to answer questions and attempt to leave the witness chair. Her examination had to be suspended once or twice on account of her excitement and irritation. Altogether, she presented a piteous spectacle of complaining, querulous, inconsequent, drivelling senility. Her testimony, with its contradictions and inanities, is in itself a sufficiently pointed commentary upon her mental condition at the time of the hearing before me. Without going to the extent of pronouncing her entirely *non compos,* or insane, I have no hesitation of saying that at the hearing before me she was in a condition of mental weakness very closely approaching men-

tal incapacity and impotence. But I do not think the facts as to her mental state in the summer of 1901 are sufficient to raise the presumption that she was in the same condition nearly six years before, on December 23d, 1895. Nor do I think the testimony to that effect convincing. The testimony of the venerable Dr. A. F. Anderson—a splendid type of the old school country physician, whose long life and labors in the service of humanity and whose simple and noble character (of which any court sitting in Chester County is justified in taking judicial cognizance) remind us of Dr. McClure, of Drumtochty, immortalized by the pen of Ian McLaren—the testimony of Dr. Anderson is to the effect that he could not see much difference in her present mental condition and that of the past condition of her mind, but that he had seen but little of her within the past twelve months; that he had not examined her with respect to her mental capacity at any time; that she was feebler physically than in the past, and that the condition of the body had some influence upon the mind. The Doctor did not see Mrs. Revels the day she was on the stand. Himself in his 83d year, while his mind seems clear and strong, it is probable that he is not as close an observer or as keen and competent a critic as when his physical vision was as clear as his mental. The testimony of the Revels family directed to this point is disregarded, for the reasons hereinafter assigned. The testimony of A. G. Brice, Esq., who saw the old lady on the day she executed deed, the 23d of December, 1895, is that she impressed him as being physically and mentally weaker, 'especially mentally weaker,' on the day of her examination before the referee than on the day deed was executed. I have no doubt that this impression is correct. It is certainly more in accord with reason and the general tenor of the facts.

"What, then, was the mental condition of Susannah Revels on December 23d, 1895? While, as I have indicated above, her mental weakness nearly six years before cannot be inferred from her mental weakness of the present, and while she is doubtless weaker intellectually to-day than she was

then, there is no question but that she was a person of feeble mental powers on the 23d of December, 1895. The testimony of all the witnesses, expert and non-expet, indicates conclusively that she was naturally a woman of limited intellectual capacity. Dr. Anderson, who had known her for fifty years, says that he 'always regarded her as a woman of feeble mental character.' Dr. J. C. Brawley, who knew Mrs. Revels for several years prior to December 23d, 1895, says that her 'mental ability' had been 'limited' ever since he knew her. He goes so far as to pronounce her case one of *dementia naturalis,* but afterwards explains that his diagnosis has reference only to 'her capacity for business affairs.' An attempt was made to show an attack of paralysis in 1891 or 1892, having the effect of further weakening her naturally feeble mental powers, but the proof as to this paralytic stroke is unsatisfactory. Dr. Anderson, who it is claimed was called in, has no recollection of it, and Dr. Brawley, the other physician, who is said to have treated her, has only a 'slight recollection' of attending her for a stroke of 'facial paralysis,' from the attack of which he says she recovered under his treatment. Dr. Brawley saw Mrs. Revels last in 1894. The testimony of the several members of the Revels family who testify as to the mental incapacity of the plaintiff at the time of the execution of the deed is given very little, if any, weight—for the reason that it is opinion evidence of ignorant, illiterate and more or less stupid non-experts, interested in having the deed in question set aside and founded upon no satisfactory facts and data. Before leaving this phase of the case, it ought to be noted that Dr. A. F. Anderson says that in his opinion the plaintiff was never 'weak-minded to the extent of being imbecilic or lunatic.' The facts and circumstances as to plaintiff's conduct and conversation prior to and at the time of executing the deed, negative the idea of total incompetency. From all the testimony I find that plaintiff's mental condition on the 23d of December, 1895, was that of a naturally weak-minded person, aggravated somewhat by the infirmities of old age.

"2. The mental weakness established, our next inquiry is as to what extent the plaintiff was capable of understanding the nature and effects of the transaction in question, to what extent did she understand it? Dr. Anderson says he does not think she would understand the difference between a deed and a mortgage; that 'she never had any business of that kind to transact; and that he could not say definitely as to her capacity for understanding a business transaction on December 23, 1895;' that he could not say that she would or would not understand the 'difference between a gift of property and borrowing money' or between a deed and a mortgage; that he has never seen her tested in a business transaction. Dr. Brawley testifies that the plaintiff has always been afflicted with *dementia naturalis* as to business affairs, but he says he never saw her have any business transactions with any one, except with himself, in regard to settlement of accounts, of which her knowledge was meager. If *dementia naturalis* is another term for idiocy, as Dr. Cox says, I do not exactly understand how a person can be an idiot as to business affairs and not an idiot as to other matters. If he is not an idiot as to anything or any class of things, then he could not be termed an idiot at all. The referee, while recognizing his incompetency to decide between learned doctors, who have exercised their immemorial privilege of differring, ventures his maiden opinion as an alienist against Dr. Brawley's theory of a *dementia naturalis* confined solely to business affairs. But while, in the opinion of Dr. Cox and of the referee, Dr. Brawley may have used his scientific term somewhat inaccurately, his meaning is clear. In his opinion, Mrs. Revels was thoroughly incompetent to transact any kind of 'business.' While the opinions of these reputable physicians is entitled to respect, it seems to me that the fact that neither of them ever examined her for the purpose of diagnosing her mental condition, nor ever saw her tested in business affairs, detracts greatly from the value of their opinions. While it is competent evidence, I do not think the bare opinion of a general practitioner of medicine,

who has not made a specialty of mental diseases, as to mental capacity, is entitled to much weight in any case. As against the opinion of the doctors, we have in this case a number of facts pertinent to the point in issue. Between 1882 and 1892, the plaintiff gave five different mortgages upon the land involved in this suit. She was appointed by the judge of probate the guardian of her children. Mike Melton, the son-in-law, an illiterate but intelligent witness, testifies that in 1892, the year he married Georgiana Revels, the old lady requested him to take up the mortgage on her land, as 'she was afraid they would foreclose mortgage and they wouldn't be able to pay it;' that the 'old lady' also requested him to lift mortgage on land of Wesley Revels, which he did. In 1895, Melton foreclosed mortgage on Wesley's land and bought it in at foreclosure sale. After foreclosure proceedings were commenced against Wesley, the old lady tells Melton she is going to take papers out of his hands, etc. The testimony of A. G. Brice and J. L. Abell as to conduct and conversation of old lady on the day deed was executed, shows clearly that she had at least a fair comprehension of what she was doing. After deed was executed, she recognized that she had conveyed land to Jeff by accusing him of lying about giving three acres to Thomas. Living as the old lady had for many years in comparative poverty upon her little farm, with the storekeeper's frown as the largest cloud upon her horizon, it is entirely reasonable to infer that she had long known the meaning of borrowing and lending money and of mortgaging and deeding the land. The evidence of Mrs. Melton as to her mother having made a will in her favor while Jeff was living away from the old home, and of her mother having put it away in her trunk, is another commentary upon the old lady's understanding of worldly concerns. While it is true that the plaintiff was to a certain extent weak-minded and very ignorant and illiterate, I cannot say she was incapable of comprehending the nature and effect of the transaction by which she conveyed her land to Jeff. On the contrary, I

believe she was capable of understanding her act and did understand it.

"3. Was the execution of this deed procured by means of undue influence on the part of Jeff Revels, the defendant? What part did Jeff play in getting the deed executed?    It is agreed that the old lady became indignant and resentful when she discovered that her son-in-law, Mike Melton, was going to foreclose his mortgage on Wesley's land—the mortgage she herself had induced him to take up three years before.    The old lady's action a few years before in getting Melton to lift the family mortgages, with which transaction neither Jeff nor any one else is connected as an advisor or instigator, indicates that she knew what foreclosure and forced sales meant, and that she had a rather deep-rooted dread of foreclosure proceedings.    It is natural to conclude that the foreclosure of Wesley's mortgage would excite her fears—perhaps, not unreasonably.    Under these conditions, I am convinced that the old lady thoroughly made up her mind, with all of the stubborn determination of a narrow and ignorant mentality, to get the mortgage on her land out of Mike Melton's hands as speedily as possible.    As to Jeff's egging his mother on in her ill-feeling toward Mike Melton, and as to his claim that his mother first brought up the subject of taking the mortgage, at the supper table, &c., I do not think the evidence on either side worthy of any great consideration.    It is probable that the supper table story is a myth. It is probable, further, that this matter of the means and methods of lifting the Melton mortgage was, from the first, thoroughly and frequently discussed between them.    Whatever the facts as to that, I am satisfied that the wish of the plaintiff to get mortgage out of Melton's hands was as much the product of her own instincts, feelings, desires and free-will as it could well be.    The method of attaining the desired end finally agreed upon, was that the old lady should deed land to Jeff, that he should assume the mortgage debt, which he had already arranged to take out of Melton's hands, and that he should support his mother the balance of her life.

Was that part of the transaction by which the land was con-
veyed to Jeff attended by such facts and circumstances as
will warrant a court of equity in setting the deed aside for
undue influence? The answer to this question is the crucial
point of the case and has given me considerable difficulty.
It depends upon the proof as to the following points of fact:

"(1) Was the plaintiff really influenced, directly or indi-
rectly, by Jeff, against her own inclination or judgment, to
give this deed of conveyance? The testimony fails to dis-
close any evidence as to any persuasion, importunity, threats
or constraint brought to bear upon the old lady by Jeff. The
old lady's mind seemed thoroughly made up as to this point.
She destroyed the somewhat mysterious papers she had made
in favor of Georgiana a few years before, when Georgiana
was the only child living with her. She came to the office of
A. G. Brice in Chester, and while there, or on that day, told
J. L. Abell that she wanted Jeff to have the land. After
Mrs. Melton had taken her out of the office and had the talk
with her on the day the deed was executed—a fact, by the
way, which Mrs. Melton, very unfortunately for herself as a
witness, positively denies—the old lady stated that 'they
didn't want her to do it, but she was going to do it anyway,'
or something to that effect. Not once does the old woman
hesitate; she appears to be thoroughly willing, almost anxi-
ous, for the step. There is no evidence that she had any
scruples from the beginning. On the contrary, it would
seem that any endeavors on Jeff's part by means of impor-
tunity, fraud, deceit or otherwise to influence his mother to
execute deed, would have been useless, for she appears to
have been a convert to that way of thinking from the first. I
do not think the testimony establishes the use of any such
means to influence her.

"(2) Are there other facts connected with the transaction
from which undue influence will be presumed? (a) The
relationship of the parties. The family sketch indicates with
sufficient clearness the peculiarly close relationship that had
existed for many years between the plaintiff and her son,

Jeff. Her youngest son, he appears to have held the Benjamin's place in the old lady's heart and life. From the date of his father's death he was the male head of the plaintiff's household—the man of the family. In that capacity he was responsible for making the little farm support his mother, his sisters and himself for many years. For one of his intelligence and condition in life he appears to have performed his part with reasonable faithfulness. Men in Jeff's station of life, as a rule, marry early; Jeff was over thirty when he took unto himself a wife. His services up to the time of his marriage seem to have been given entirely to his mother and sisters. I do not think Jeff could pose as a modern Aeneas, or as a satisfactory exemplar of any particular virtue; but, so far as filial piety is concerned, up to the time of the making of this deed, he shows up better than any of his sisters or brothers. There is nothing in his life during the said period to indicate that he was at all unworthy, as compared with her other children, of the old woman's affection and confidence. He even seems to have done more than most favorite sons to have deserved his place in the old lady's regard. Such was the tie that existed between these two persons when this conveyance from mother to son was determined upon. Was that determination on the old lady's part the result of the skilful and artful touch of the scheming son upon the strings of maternal affection, or of the subtle but potent influence of the strong mind upon the weak? The facts are that Jeff was as ignorant and illiterate as his mother. He impressed me by his demeanor as a witness with having very little sense. From such light as the testimony throws upon the matter, I am constrained to think Jeff's mental capacity was very little superior to his mother's, when the deed was made. He certainly was not the man to conceive the scheme of having the old lady execute the conveyance and carrying it out so successfully—if it had been in any way contrary to the old lady's real desires and intentions.     ..

"(b) Such being the relationship of the parties and the footing upon which they stood, was the conveyance in ques-

tion as between these parties, under all the circumstances, for
an inadequate consideration or unfair or inequitable in any
way? I do not think so. I cannot say that the price of
$400 was in itself grossly inadequate for the 96 1-2 acres of
land in question. Taken in connection with Jeff's long ser-
vice in his mother's house, his mother's affection for him and
his agreement to take care of her the balance of her life, I do
not think the consideration of the deed by any means uncon-
scionably inadequate. I do not think the nature of plaintiff's
act justifies the conclusion that she did not exercise her delib-
erate judgment in conveying the land to Jeff. If it be true
that such a relationship as existed between the plaintiff and
her son, Jeff, raises a presumption that the son exercised a
controlling influence over the will and conduct of the mother,
it is equally true that such a relationship raises the presump-
tion that such an agreement as the turning over of her
worldly affairs and property interest to her favorite son, was
in accord with the freest instincts, promptings and desires of
her untrammelled heart and reason:

> 'To shake all cares and business from our age,
> Conferring them on younger strengths, while we
> Unburthen'd crawl toward death,'

is one of the strong propensities of human nature. She had
the right—most highly respected by our law—of disposing
of her own as she pleased. Her son, Tom, testifies that he
had long before this heard his mother say that she intended
Jeff to have everything she had. She told Mr. Abell, the
day the deed was executed, she wanted Jeff to have the land.
'Love and affection,' a good consideration in itself, taken in
connection with the valuable consideration and the promise
of future care and support, moving from Jeff, is certainly
sufficient in this case to rebut any presumption of undue in-
fluence. In this connection, I do not think the absence of
independent counsel for the old lady is of any consequence.
Mr. A. G. Brice, the distinguished counsel who drew the
papers for these parties, acted with scrupulous fairness in the

premises, carrying into effect faithfully the agreement which he understood had been arrived at between them before coming to his office. There was no secrecy about the transaction and nothing to indicate to Mr. Brice that there was anything wrong about it. In view of my findings as to the fairness of the transaction, the matter of absence of independent counsel is not material. She did what she had a right to do, what was natural for her to do—an intention which she confirmed and ratified two years later, when she signed the second deed over the earnest protests of her aged neighbor and counselor, Maj. Lowry, who drew the deed.

"(c) There is no question that Jeff agreed to support and care for his mother the remainder of her life, and that this agreement was a part of the consideration of and for the deed. Granting that this agreement should have been inserted in the deed of conveyance, was the failure to insert it the result of artifice or cunning on Jeff's part? I do not think that at all certain. Jeff stated to several persons before and after the execution of the deed that he was to take care of his mother for the rest of her life. He so stated to Mr. Abell the day the papers were drawn. In the second deed, a paper, the execution of which grew out of misunderstanding and muddled wits, Jeff's agreement to support is in the deed. Neither the mother nor the son mentioned that agreement in advising Mr. Brice as to the preparation of the deed in question. They were both persons who might easily make a mistake of that kind, persons whose familiarity with the details of conveyancing contracts, and whose general information was not such as to make the failure to have the provision inserted in the deed a badge of bad faith in itself. That it was not an omission, contrived with fraudulent intent, by Jeff, his after-conduct in fully and freely accepting the responsibility for his mother's support and care, is strong circumstantial evidence. I believe the omission was the result of mutual mistake.

"(d) Granting that a promise to support should have been written in the deed and regarding it as a real part of the con-

sideration, has the defendant, Jeff Revels, failed to meet and keep his obligation in that respect? Has there been a failure of the consideration in that regard? So far as the testimony shows, there has never been any attempt on Jeff's part to escape his obligation to support and care for his mother. Where the aged parent turns over his estate to the child upon his filial promise of support and care, we are apt to find, in too many cases, that the child has lost 'the pregnant and potential spurs' to filial duty. It is the Fool in King Lear, I think, who speaks of such a parent as one 'that giveth his children the rod and putteth down his own breeches.' While, as I have said, Jeff is by no means a model son, for one of his antecedents, environment and mental and moral fibre, he seems to have done his duty by his mother surprisingly well. Up until the time she went to Mrs. Roof's, in response to the latter's invitation to visit her at Factory Hill, in Chester, in January, 1900, Jeff had, ever since the execution of the deed, supported and cared for his mother as an inmate of his home. The old lady having fallen sick at Mrs. Roof's and having lain there for several months seriously ill, Mrs. Roof seems to have repented of her hospitabe intentions, and preferred a claim against Jeff for his mother's support for the time she had been with her. Jeff had been to see his mother several times during her illness, but nothing had been said to him about paying his mother's board or taking her away. As soon as he received notice of the claim through Attorney Newbold, Jeff came for his mother and took her to his home. I do not think the allegations as to ill-treatment and abuse are sustained. It is significant that the time she was found with vermin on her was a short time after she came back from Mrs. Roof's. There is no doubt that from the time of her sickness at Mrs. Roof's, she has been a great charge and burden upon those about her. Jeff Revel's wife, a woman who impressed me favorably as a witness in the case, has been a good deal of an invalid herself for several years, and it may be that the old lady might have lacked certain attentions on that account; but there is no satisfactory evidence that Jeff either

failed to provide for his mother or that he neglected and abused her. Certainly the other children have not developed any very attractive traits or devoted deeds, in the way of filial piety or otherwise, so far as the testimony reveals.

"4. Is the bringing of this action the act and deed of the plaintiff, conceived and executed in the exercise of a free, intelligent and responsible will? This suit was commenced over five years after the old lady had deeded the land to Jeff. It was commenced while she was at Mrs. Roof's, where she had gone a second time in the fall of 1900. When she appeared as a witness in this case, four and one half months after suit was started, there is no doubt she was mentally irresponsible, or very nearly so. Dr. McConnell's testimony establishes that she was almost, if not quite, in that condition when he treated her at Mrs. Roof's in the spring of 1900. I am satisfied that she was very nearly, if not quite, mentally incapable, when this action was commenced. The setting aside of the deed to Jeff Revels by means of this action is the equivalent, practically, of her writing a new deed, conveying all her land to all her children in equal proportions, for it is almost certain that no will or other disposition of her property she could now make, or make between this and the swift-coming death hour, could be considered the act of a person of sane mind. The first deed, the conveyance to Jeff, was reasonable, natural and fair; this second deed, which the old lady would write by means of a decree of this Court—giving a pittance carved out of the little plantation to each of her other numerous progeny, none of whom have any special claim upon her bounty—would be unnatural and unfair, as well as the act of a person virtually *non compos mentis.* Passing over the fact that Jeff Revels has partly performed his contract to support his mother and has made some payments upon the mortgaged debt assumed by him, the present condition of the plaintiff's mind makes it impossible to place the parties in *statu quo,* from a legal standpoint, by cancelling the deed of December 23, 1895.

"5. In view of the findings of fact and conclusions of law

reached as to the deed of December 23, 1895, it will not be necessary to consider in detail the second deed of August 31, 1897, or the mortgage of the defendant, J. L. Abell.

"Upon the above review of the facts, I submit the following findings:

"1. That on the 23d of December, 1895, the day deed in question in this case was executed, the plaintiff herein was a woman about 76 years old, ignorant and illiterate, and of naturally weak mental powers, aggravated to some extent by old age.

"2. That, notwithstanding her ignorance and mental feebleness, the plaintiff was capable of understanding the general nature and effects of the deed aforesaid, whereby she conveyed the land described in the complaint to her son, the defendant, Jefferson D. Revels, and in fact did understand her said act and deed.

"3. That the execution of said deed of conveyance was not procured by fraud, threats or undue influence on the part of the defendant, Jeff D. Revels.

"4. That the consideration of the said deed was not grossly inadequate, that the said conveyance was thoroughly in accord with the plaintiff's will and wishes, and that the transaction was not unfair and unequitable in any way.

"5. That the agreement on the part of Jeff D. Revels to support and care for his mother, the plaintiff, during the remainder of her life, was a part of the consideration of and for said deed of conveyance, and that the failure to insert said agreement in the deed was contrary to the intention of both parties, being due to mutual mistake.

"6. That the plaintiff's present mental condition, taken in connection with the other circumstances, raises the presumption that the bringing and prosecution of this suit is not an act of the plaintiff's free, intelligent will, and makes it impossible to restore said parties to the *status quo ante.*

"7. That the defendant, Josh. L. Abell, is the owner and holder of a mortgage upon the premises described in the complaint, that the condition of said mortgage has been broken,

and that there is now due upon the debt secured by said mortgage the sum of $    .

"The principles of law governing this case may be briefly stated as follows : The acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in a court of equity and relief by recission granted, if it appear that such acts or contracts were, in fact, induced or procured by imposition or undue influence, or if the nature of the act or contract, or of the conditions or circumstances under which it was executed, show unfairness or advantage taken, or justify the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overcome by cunning, artifice or undue influence.    Story's Equity Jurisprudence, sec. 238 ; *Banker* v. *Hendricks,* 24 S. C., 1 ; *Gaston* v. *Bennett,* 30 S. C., 473 ; *Wille* v. *Wille,* 57 S. C., 427 ; *Allore* v. *Jewell,* 94 U. S., 506.    On the other hand, unless there is great inadequacy of consideration, or some other evidence of fraud, imposition or over-reaching, any degree of imbecility will not suffice to avoid a deed.    *Henderson* v. *McGregor,* 30 Wis., 78, and fifteen other cases cited in note to *Allore* v. *Jewell,* book 24, L. C. P. Co.'s U. S. Supreme Court Reports.    'Absolute soundness of mind is not necessary to enable one to make a valid conceyance.    It is sufficient if the mind fully comprehend the import of the particular act.'    *Rippey* v. *Grant,* 4 Iredell, 443 ; *Miller* v. *Craig,* 36 Ill., 109 ; *Dennett* v. *Craig,* 44 N. H., 531.    'In all cases involving an inquiry of this sort, in order to avoid erroneous conclusions, the strictest attention must be paid to the particular circumstances, so as to ascertain, if delusion and infirmity appear, whether they are so connected with the act, the validity of which is in dispute, as to show that as to that act, the intelligent assenting mind was wanting.'    Barrows, J., in *Hovey* v. *Hobson,* 55 Me., 282.

"As to reformation, the rule under which conclusion No. 2, as hereinafter stated, is reached, is as follows : 'Where an agreement is made and reduced to writing, but through mis-

take, inadvertence or fraud, the writing fails to express correctly the contract really made, a court of equity will reform the instrument in conformity with the real intention of the parties.' 20 A. & E. Ency. Law, 713. It is evident that any discussion of any law applicable to this case is unnecessary. The law is plain and comparatively simple. The determination of the issues depend upon a careful critical analysis and weighing of the facts. In the well considered and able argument for the plaintiff, the effort was made to put this case upon all-fours as to the facts with the recent case of Wille *v.* Wille. The analogy fails as to more than one vital point. In the Wille case the deed was executed under a mistake of fact on part of grantor, who believed she was executing a will, the valuable consideration was entirely nominal and the contract itself improvident and unreasonable. And so, I believe, little is to be gained by a study of cases—a number of which in our own reports, I have examined. Every case must stand upon its own bottom, and that is particularly true in a case of this kind. Appreciating that fact, I have endeavored to indicate, in some measure, the character and manner of the witnesses and the impressions produced by them—with, perhanps, unnecessary candor in some instances—but in the interest of the truth, as I see it. Judge Wardlaw, in *Means* v. *Means,* 5 Strob., 189, says: (Where) 'There has been conflict of testimony—many witnesses on one side, all fair upon paper, may have been disbelieved, and slight testimony on the other side, from the character and manner of a witness, or circumstances which attended the trial and fell within the observation of the jury, may have justly acquired force, which cannot here be appreciated.'

"Upon the facts above found, the conclusions below stated necessarily follow:

"1. That the deed of conveyance of date December 23, 1895, from the plaintiff, Susannah Revels, to the defendant, Jeff D. Revels, is a valid and binding contract, and that the

18—64

plaintiff herein is not entitled to have said instrument rescinded or cancelled.

"2. That the said deed of December 23, 1895, should be reformed to the extent of having written therein as a part of the consideration therefor the promise of the grantee, Jeff D. Revels, properly to support and care for his mother, the grantor, Susannah Revels, for and during her natural life.

"3. That the defendant, Josh L. Abell, is entitled, if he so desires, to an order of foreclosure and sale of the premises described in the complaint, the proceeds of such sale to be applied to the payment of his mortgage debt, with the interest thereon, after the payment of a certain portion of the costs, as hereinafter provided.

"4. That in the event the defendant, Abell, shall not demand the foreclosure of his mortgage in this action, the plaintiff herein shall be liable for one-half of the costs of this action, and the defendant for the other half thereof; in the event said mortgage be foreclosed and premises sold, three-fourths of the costs shall be taxed against the defendant, to be first paid from the proceeds of the sale of the mortgaged premises, and the remaining one-fourth thereof shall be taxed against the plaintiff."

From Circuit decree overruling this report and giving judgment in favor of plaintiff, defendant, Revels, appeals.

*Messrs. Glenn & McFadden,* for appellant.

*Messrs. Caldwell & Gaston,* contra, cite: *As to relief because of inadequacy of price:* Pom. Eq. Jur., sec. 928; 14 Ency., 2 ed., 204. *As to presumption of undue influence:* 57 S. C., 425; 94 U. S., 511; Story Eq. Jur., sec. 218. *Courts of equity will grant relief from imposition by reason of confidential relations:* 1 McC. Eq., 390; 4 DeS., 652; 14 Ency., 2 ed., 194; Story Eq. Jur., secs. 251, 309; 8 How., 183; 94 U. S., 506; 61 S. C., 506. *Trustee must make fair and full explanation:* 61 S. C., 505; 2 Pom. Eq. Jur., sec. 956; 16 Ency., 2 ed., 628; Pom. Eq. Jur., 947.

June 19, 1902. The opinion of the Court was delivered by

MR. JUSTICE POPE. Ninety-six and a half acres of land is the contention between mother and son—or, rather, all the children except the son have influenced the mother to turn against her son. Surely the love of money is the root of all evil. The story is soon told. The plain story is short. Not long after the war, the plaintiff, who was the mother of seven children, was left a widow. Three of these children, two girls and a boy, were left to the care of their mother, the plaintiff. This 96 1-2 acres of land was assigned to the widow in the partition of her husband's estate. She could not work in the field, yet she must have managed her household affairs well. Her son, Jefferson D. Revels, clung to his mother, he cultivated her land from the year 1874 so that the generous yield therefrom supported mother and all three children. One by one the girls married and would leave the family nest. When only one was left, Jeff himself married. Bickerings between the daughter and the daughter-in-law caused Jeff to take his wife a little distance from his mother, but not to such a distance as to fail to work for her and, too, only staying away until he could put himself up a modest cottage on his mother's land. As soon as this last daughter married, the mother had her son to come back with his wife into the family residence. The plaintiff, through some misfortune, had to borrow a few hundred dollars. A kind lady lent the money on a mortgage of her land, and was very indulgent. Finally, after years, a son-in-law of the plaintiff. at her request, took up the mortgage debt. This same son-in-law took up a mortgage that Wesley Revels, a son of the plaintiff, had given on his lands. The debt not being paid this son-in-law, Mr. Mike Melton, foreclosed his mortgage, and bought the land at the sale. Thus Wesley Revels was turned out into the public highway. This was too much for the mother, the plaintiff. Instantly she was filled with forebodings as to her own fate at the hands of her son in law. The defendant did not take any part against his brother-in-

law ; but the plaintiff could not be quieted.   Finally she pro-
posed to her son, Jefferson, the defendant, that if he would
take up the mortgage held by Mr. Mike Melton and would
also agree to support the plaintiff the balance of her life, she
would convey the 96 1-2 acres of land to him.   He consented
to try to take up the mortgage.   The result was that the de-
fendant, J. L. Abell, agreed to advance the money to pay off
the mortgage held by Mr. Mike Melton, provided that the
defendant, Jefferson D. Revels, would, as soon as the plain-
tiff conveyed the land to him, execute a mortgage on the land
to secure the money necessary to satisfy Mr. Melton's mort-
gage.   So the parties went to the town of Chester, S. C., into
the law office of Mr. A. G. Brice, where the latter prepared
the deed from the plaintiff to the defendant, Jefferson D.
Revels, who at the same time prepared a deed by way of
mortgage of the same land to J. L. Abell for $360, which was
executed as a part of the same transaction by the said Jeffer-
son D. Revels.   A daughter of the plaintiff took her mother
out of the office while the papers were being prepared, and
urged her mother not to sign the papers.   The mother's re-
ply was : "I know what I am doing," and returned and exe-
cuted the papers.   All these things happened in the year
1895.   Thereafter, the plaintiff returned to her old home ·
and resided there as a member of her son Jefferson's family.
At his table Jefferson always helped his mother's plate first of
all the family until some time during the year 1900.   On 1st
January, 1901, this action was begun to cancel the convey-
ance in question, on the ground that plaintiff was a very old ·
woman, of weak mind, unprotected and dominated by the
influence of her son, Jefferson, without consideration, but
through fear of him, by his intimidation of her, by his fraud,
&c., had made the same without understanding what she was
doing.   The consideration named in the deed was $400,
while the mortgage of Mr. Melton was only $360.   The an-
swer of the defendant denied all wrong doing.   The issues
of law and fact were referred to J. H. Marion, Esq.   His
report is clear and strong, and was in favor of the defendant

on all the issues of law and fact.   Plaintiff excepted to his report, and upon the hearing before Judge Ernest Gary, he pronounced a decree in favor of the plaintiff, and ordered the deed cancelled.   Upon appeal, we have given the case full consideration, and as the result thereof we find ourselves in favor of the views of Mr. Marion, as special referee.   His report must be reported.   We will not repeat a discussion of the facts.   However, it is apparent to us that the defendant, Jefferson D. Revels, should execute a deed to Susannah Revels, wherein he must bind himself to support his mother, the plaintiff, for and during her lifetime as a member of his family, but not to include her expenses while living anywhere else than in his family.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the complaint be dismissed, upon the execution of a deed by the defendant, Jefferson D. Revels, to his mother, Mrs. Susannah Revels, whereby he binds himself to give her a support for and during her natural life, and so long as she resides with him.

MR. JUSTICE JONES *concurs in the result*