14438

MITCHUM *ET AL.* v. MITCHUM

(190 S. E., 104)

76

July, 1936.

*Mr. A. C. Hinds,* for appellants,

*Messrs. F. R. Hemingway* and *J. D. O'Bryan,* for respondents,

February 17, 1937.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

On first view of this appeal, the writer of this opinion was inclined to think that the decree of the Circuit Court should be affirmed. A close study of the law pertinent to the issues and a more thorough analysis of the evidence have led him to the opposite conclusion. It is a suit in equity. It was referred to a Special Referee to hear and determine all the issues of law and of fact. He reported in favor of the plaintiffs, who are the appellants here. On hearing exceptions to that report, the Circuit Judge reversed the findings of fact and conclusions of law and made a decree in favor of the defendant, who is the respondent here. From this decree, plaintiffs appeal.

The appellants and respondent own lands adjacent, but separated by a public road. All of them raise tobacco. In the curing of the tobacco, barns are used in which the weed is cured by heat engendered by fires. This process is dangerous,

since, if the barn burns, not only is the tobacco lost, but nearby property is endangered. This makes the rate of insurance high and, if the surroundings add to the danger, the rates are prohibitive. In addition to three barns, the appellants had a packing house, where the leaf tobacco is further treated in the preparation for the market. It was determined by appellants to move this packing house away from the vicinity of the barns. While preparations for moving the packing house were in progress, it was decided to move it to a point further away from the barns than that first selected. The place now agreed upon was opposite a tobacco barn on the land of the respondent, across the public road, 58 feet away, which proximity would endanger the safety of the packing house.

Now comes the conflict in the testimony.

The plaintiffs allege that Marvin B. Michum, in charge of the plaintiffs' lands and planting interests, and who was superintending the moving of the packing house, went across to the home of J. H. Mitchum and proposed to him that, inasmuch as his (J. H. Mitchum's) tobacco barn was old and dilapidated, and in its present situation was a menace to plaintiffs' packing house if placed at the point to which plaintiffs wished to move it, if defendant would build a new barn at some other place on his land, plaintiffs would saw for him all the lumber he needed for the new barn. It is alleged that J. H. Mitchum agreed to this proposition, but that, after plaintiffs had moved the packing house to the new place, he refused to carry out his part of the agreement, although plaintiffs have tendered performance on their part and are now, and have always been, ready to perform. They pray that defendant be required to perform his part of it.

For answer, the defendant admits the formal allegations of Paragraphs 1, 2, and 3 of the complaint and denies all others. For further answer, he alleges that at the times set out in the complaint the control and possession of his tract of land was not in him; that he had leased it and the tobacco

barn to Mrs. J. R. Joyner. For further answer, that plaintiffs own some 200 acres of land and the packhouse of plaintiffs could with ease and convenience to plaintiffs be moved to a more convenient place, whereas it would be inconvenient and detrimental for the defendant to move the tobacco barn on his place, and would be to his material injury and damage to a much greater extent than the building of a new tobacco barn would have been compensation. For further answer, denies that there was any contract between plaintiffs and himself stating time, place, terms, and condiitons and settling all questions arising relative to moving the said tobacco packhouse and tobacco barn; that is, this defendant denies a contract as alleged in the complaint. For further answer, if there was a contract as alleged in the complaint, it related to lands and things pertaining thereto, was not in writing, and is obnoxious to the statute of frauds.

The case was referred to W. C. Davis, Esquire, a lawyer of ability and long experience, to hear and determine all issues of law and fact. From his report so much is taken as follows here:

"The chief issue of fact is whether or not plaintiffs and defendant entered into the contract set forth in the complaint.

"The contract stated in the complaint is sufficiently clear, definite and certain in its terms. The distinct preponderance of the evidence completely and definitely establishes the contract as alleged in the complaint. The contract relates to real property and is not in writing but is a parol contract. Relying upon the promise of the defendant to move the tobacco barn on the premises of the defendant, the plaintiffs moved the packhouse to a point within sixty-two feet of the old tobacco barn on defendant's property. Thereby the plaintiffs are placed in a position of grave disadvantage by reason of the extreme fire hazard of the defendant's old tobacco barn. The plaintiffs offered and tendered full performance of their part of the contract and declare themselves ready and willing

to still perform their part of the contract and capable of doing so. By reason of the change of the position of plaintiffs to their disadvantage, the defendant is estopped from setting up the Statute of Frauds which, together with the performance of the contract by the plaintiffs on their part, takes the case out of the Statute of Frauds. The contract is fair; no claim of unfairness was made by the defendant.

"The fact that a portion of the J. H. Mitchum land was rented by Mrs. J. R. Joyner is ineffective insofar as the plaintiffs are concerned, because the lease introduced in evidence on this point was not recorded previous to the time the contract was entered into and there is nothing in the record to show that notice of the lease was brought to the plaintiffs. Furthermore, the prompt performance of the contract by the defendant would not affect Mrs. Joyner adversely; on the contrary, a new tobacco barn on the premises farmed by her would be promotive of her welfare.

"That time is not the essence of a contract sought to be enforced is too well established in this State to need the citation of authorities. The defendant has no cause to complain about the failure to fix the place where the new barn would be located on his own land, since he had the right to locate it wherever he pleased, beyond the zone of danger to plaintiffs' packhouse. The terms and conditions of the contract stated in the complaint are, as already stated, sufficiently clear and definite.

"I listened attentively to the testimony of the witnesses at the reference, and have read the testimony after it was transcribed, and have given full consideration to the entire record, and have reached the clear conclusion that the plaintiffs are entitled to the specific performance of the contract involved in this case.

"I, therefore, respectfully recommend that a decree be issued directing the specific performance of the contract and that the costs and disbursements of the suit be taxed and entered up against the defendant."

The defendant filed exceptions to the report, which were heard by Judge Stoll, who filed a decree reversing the findings and conclusions of the Referee. From it we take the following:

"After hearing argument of Counsel representing both plaintiffs and defendant, and after a careful consideration of the testimony, I am of the opinion that the Referee erred in his conclusions and findings.

"The alleged contract is an oral one, and the proof thereof offered by the plaintiffs is indefinite and uncertain, and is not clear, definite and unequivocal as required by the rules governing such cases as laid down and adopted by our Courts. The testimony offered by the plaintiffs was to the effect that they offered to do certain sawing for the defendant if he would move the barn in question. The defendant testified that sometime prior to the date on which the alleged contract was made the plaintiff Marvin B. Mitchum, did make such offer but the same was not accepted, and he, the defendant, in turn offered to move such barn if said plaintiff would furnish him enough shingles to cover a new barn, and this the plaintiffs refused to do, consequently such negotiations did not result in any agreement as there was no meeting of the minds.

"A Court of Equity will not decree specific performance unless the contract before the Court is fair, just and equitable. The plaintiffs were the movers in this case, and the contract set up in the complaint, if proven, was inequitable, in that the moving of the barn in question was entirely for the convenience and benefit of the plaintiffs; the undisputed evidence shows that the defendant had on hand a large part of the lumber necessary to construct a new barn and could use a portion of the material from the old barn, and all that the plaintiffs were to do toward the construction of the new barn was to saw the logs necessary to produce the balance of the lumber needed for the new building. This service the plaintiff, Marvin B. Mitchum, testified would be worth only

Sixteen ($16.00) Dollars, and considering all the facts and circumstances in the case, I have reached the conclusion that if the alleged contract in the case had been proven, it was not a fair, just and equitable one and of such character that a Court of Equity should decree specific performance thereof.

"Having reached the conclusion that no contract was ever made between the parties as to the removal of the tobacco barn which is the subject of this action, and that even though the alleged contract had been proved it was not a fair, just and equitable one enforcible by a Court of Equity, the plaintiffs are not entitled to the relief demanded, therefore,

"It is Ordered that the Exceptions to the Report of the Referee be sustained, the Report of the Referee reversed, and the complaint be dismissed with costs."

It may be conceded without the citation of authorities that the enforcement of a contract for specific performance is not a matter of right, but rests in the sound discretion of the Court. But it is equally true that the question of the proper judicial exercise of that discretion will depend upon the facts and circumstances of each case. *Yawkey v. Lowndes,* 150 S. C., 493, 148 S. E., 554.

We are considering the facts pertaining to a case which turns solely upon the facts—in order to determine whether there was a contract between the parties enforcible in law The Special Referee heard and saw the witnesses, and held that there was an enforcible contract; the Circuit Judge held otherwise. It devolves upon this Court to decide which was right.

This question has long been considered and determined by the Courts of Appeal—even during the days of the existence of the Courts of Chancery.

In the case of *Means v. Means,* 5 Strob., star page 167, Judge Wardlaw, for the old Court of Appeals, said: "This Court feels, and often shows by its decisions, how absolutely necessary it is; in general, where there has been no misdirec-

tion, to sustain verdicts upon facts, even against strong impressions to the contrary, which reports of the testimony may produce. In one case there has been conflict of testimony —many witnesses on one side, all fair upon paper, may have been disbelieved, and slight testimony on the other side, from the character and manner of a witness, or circumstances which attended the trial, and fell within the observation of the jury, *may have justly acquired force, which cannot be here appreciated."* (Italics added.)

This pronouncement of the justly famed lawyer applies with equal force to the differing views of the Referee, who sees and hears the witnesses, and the Judge, who reads the testimony from the page.

In the case of *Revels v. Revels,* 64 S. C., 256, 42 S. E., 111, the case was referred to J. H. Marion, Esquire, afterwards a Junstice of this Court. He filed an able report, setting forth exhaustively the evidence in the case. The case was heard by Circuit Judge Ernest Gary, and was reversed. On appeal the decree of the Circuit Judge was reversed, and the report of the Referee sustained.

In the case of *Dewitt v. Atkinson,* 6 S. C., 140, it was referred to E. A. Law, Esquire, to hear and determine the issues of law and fact raised in the case. "The Referee examined the evidence at length, and reported as his conclusion of fact that no such agreement as that alleged by defendants was made by Dewitt and Atkinson."

On exceptions to the report of the Referee, "His Honor the presiding Judge also reviewed the evidence at length and came to the conclusion that it established the existence of the agreement alleged by the defendants."

On appeal the Supreme Court reviewed the testimony concerned in the finding of fact by the Referee, and reversed the decree of the Circuit Court.

In the case of *Perry v. Sullivan Mfg. Co.,* 6 S. C., 310, it appears that the issues of law and fact were referred to a Special Referee, who took the testimony and reported in

favor of the plaintiff. On exceptions to the report by the defendant, the Circuit Judge overruled the finding of the Referee as to the amount due plaintiff "as contrary to the evidence in the case." On appeal the Supreme Court said:

"We have on more than one occasion expressed the views by which this Court will be governed on appeals in chancery cases involving only questions of fact, both where they are made on the conclusions of the Judge below, from the testimony heard *ore tenus* by him, or reached through the report of a Referee in which he either concurs or from which he may differ. In *Dewitt et al. v. Atkinson et al.* (decided at the last term [6 S. C., 140]), where the whole testimony was taken by the Referee, we felt bound to sustain his judgment, although overruled by the Circuit Court, because, as was there said, the presiding Judge had no better means of estimating the comparative force of the evidence as rendered by the respective witnesses. His opportunity of discriminating either as to their relative intelligence or the effect of their manner while testifying was not greater than that allowed to us. His impressions, as our own, are only derived from the report of the Referee, who, from a knowledge of the witnesses, has a better opportunity of comparing their intelligence and determining the effect of their evidence.

"When a case is referred to a Referee to ascertain facts, he is substituted in the place of a jury, and his report should be recognized as equivalent to the verdict of such a body. * * *

"The same considerations which would govern the Judge on a motion to set aside a verdict and grant a new trial should prevail on a motion to reverse the report of a Referee on the facts."

In the case of *Davidson v. Moore*, 14 S. C., 251, 252, the issues were referred to C. E. Spencer, Esquire. On exceptions to the report, the Circuit Judge reversed it in certain particulars. On one such issue of fact, the Supreme Court said: "We are unable to discover any sufficient reason for

overruling the finding of fact by the Referee in regard to the credit * * * allowed the executor. * * * It is true that the testimony upon this point is somewhat conflicting, but the Referee, who had the witnesses before him, has reached the conclusion that the weight of the testimony was in favor of allowing the credit, and we think his conclusion should have been adopted, unless it was shown, as we do not think it has been, that his conclusion could not be sustained by the testimony. *Dewitt v. Attkinson,* 6 S. C., 140. The judgment of the Cirucit Court is, in this respect, reversed, and the report of the Referee, as to this matter, is confirmed."

In the case of *Badder v. Saleeby,* 131 S. C., 101, 126 S. E., 438, 439, this is found: "This is a suit in equity to cancel a contract for fraud."

The matter was referred to the Master, who took the testimony and filed a report in favor of the plaintiff. On appeal the Circuit Court reversed the report of the Master. On appeal to this Court the judgment of the Circuit Court was reversed and the report of the Master reinstated as the judgment of the Court. This Court said: "After careful consideration of the entire record we are of the opinion that the report of the Master comes nearer affording a fair and equitable solution of the controversy than is presented by the decree of the Circuit Judge, or than we could hope to reach by an independent analysis of the evidence or restatement of the accounts. *The Master saw the witnesses, heard the testimony delivered from the stand, and had the benefit of that personal observation of and contact with parties and witnesses which may be of peculiar value in arriving at a correct result in a case of this character.* See *Means v. Means,* 5 Strob. [167], 189; *Revels v. Revels,* 64 S. C., [256], 273, 42 S. E., 111. *Unless, therefore, the reasons suggested by the learned Circuit Judge imperatively require that the report of the Master should be set aside, we think, the Master's report should be approved.*" (Italics added.)

The deduction to be made from these authorities is conclusive that, unless there is error so patent as to make it obligatory on the Circuit Judge to reverse the findings and conclusions of the Referee's report, it should be approved; and the obligation is on the party appealing from the report to point out such imperative error.

4   We do not think that has been done in this case.

His Honor, the Circuit Judge, bases his decree reversing the report of the Special Referee upon the two propositions that:

"The alleged contract is an oral one and the proof thereof, offered by the plaintiffs, is indefinite and uncertain, and is not clear, definite and unequivocal as required by the rules governing such cases as laid down and adopted by our Courts.

"2. That even though the alleged contract had been proven, it was not a fair, just and equitable one enforceable by a Court of Equity."

The situation at the time of the alleged contract may be thus stated:

Marion B. Mitchum had on his place three tobacco barns where the tobacco is cured, by the use of fires, and a packhouse where the tobacco is prepared for the market. Realizing that there was hazard to the packhouse from fire from the curing barns, he determined to move the packhouse to a point on his own premises. It was suggested that he could move it still further on his own lands, but that would bring it to a point opposite an old dilapidated barn on the land of J. H. Mitchum, only 58 feet away. Realizing that this would not remove the fire hazard to his packhouse, he alleges and, we think, as did the Referee, proves that he saw J. H. Mitchum and made an agreement with him that, if J. H. Mitchum would tear down his old and dangerous tobacco barn, he (Marvin B. Mitchum) would saw for him all the lumber he would need for the new barn.

Marvin B. Mitchum testifies unequivocably that he proposed to J. H. Mitchum in this wise:

"I told him I wanted to move my packhouse but that old dilapidated barn, it was too close to be safe. I told him that he could not cure in the barn over a couple of years at best, and if he would agree to tear down the barn and build another I would saw the lumber free of charge for him to build another barn. He accepted it over at the barn in the presence of W. T. Smith and W. G. Cantley, and went on back home. That is exactly the situation. In other words, I was to saw free the lumber it would take to build another barn. He said that he could use the framing out of the old barn, and he would have enough framing left from his dwelling house, he was constructing a dwelling house at that time. And he further said that all he would need would be some weatherboarding. I told him that whatever he needed I would saw. I have a saw mill on my place and I was to saw it when he put the logs on the bed. He agreed. * * *

"Q. Did you at any subsequent time have a conversation with Mr. J. H. Mitchum? A. Mr. Cantley was at my house and he wanted to see Mr. John Mitchum about something and we went down and Mr. Mitchum was in front of his barn, sitting on a ladder, and I asked him—'John, I want to know what you are going to do about the packhouse? You have damaged me, I have got to do something. I am ready to cut the lumber.' He said—'Well, you will never remember cutting a board for me.' I told him that something had to be done. He said 'until twelve men decide I have to do it, I will not do anything. Not until twelve men say that I have to do it.' I meet him again—there was not anybody there but me, and I asked him if we could not get together, and he gave me the same reply.

"Q. That last conversation when Mr. Cantley was there did you tell John Mitchum that he had agreed to do this? A. He admitted that he agreed to do it, but he said that circumstances had arisen—but that I had treated him so

terribly bad. I have never been able to find out about the treatment.

"Q. Now what did he state in the presence of Mr. Smith and Mr. W. G. Cantley after you and he came back from his house to the place where the preparations were being made? A. To go ahead and move the barn, that he would do away with his barn; that he could use certain parts of his barn, framing, that would be left, all that he needed would be some weatherboarding. I said, 'Whatever you need I will saw, it does not make any difference how much.'

"Q. Did he agree to that? A. Absolutely; no dissension.

"Q. After he agreed to the proposal did you proceed to move the packhouse? A. Yes, sir."

W. Gordon Cantley testified.

"Q. In the spring of 1935, did you assist Mr. Marvin Mitchum in making preparations for the moving of a packhouse? A. I did, sir.

"Q. Who else was assisting—white men? A. Myself, Mr. Tom Smith, Marvin Mitchum and several colored people, I can't say exactly how many, twenty probably, or more.

"Q. The white people who were there—the white people there were you, Marvin Mitchum and Mr. Tom Smith? A. Yes, sir.

"Q. While there making the preparations for moving the packhouse, did Marvin Mitchum leave that place and go towards the house of John Mitchum? A. Yes, sir.

"Q. When Mr. Marvin Mitchum came back did anyone come with him? A. Yes, sir, John Mitchum came back with him. * * *

"Q. What did Mr. Mitchum state in your presence and in the presence of Mr. Smith? A. When he came back to where we were getting the barn back on the skids, when they came back—we were getting the barn in preparation to move, when Marvin Mitchum came back he said, 'I have made an agreement with John, and we will move the packhouse down by the ditch.' He said, 'Then I will be satisfied about the

fire.' He told me that John had agreed to tear down the old barn and build a new barn, he said that he was to saw the lumber for him to build a barn the same size that the old barn was. John Mitchum agreed. He said, 'That barn is about "shot," I wi'' build another barn and get it nearer to the house where it will be more convenient. I will have practically framing enough left from my dwelling house and I won't need anything much but weatherboarding.' Marvin said 'I will saw the lumber to build the barn regardless of what it takes to do it.' * * *

"Now, Mr. Cantley, in the fall of 1935, did you have or hear any conversation of John Mitchum in connection with the matter? A. Yes, sir, I was present when Marvin Mitchum asked John Mitchum what he was going to do about the tobacco barn.

"Q. What happened then? A. Marvin Mitchum told John, 'John, I want to know what you are going to do about this barn, you are going to move it as you agreed to?' John said, 'No, I am not, Marvin, I would have gone on and carried out my part of the agreement if you had let me have those shingles—I was balled up in my dwelling. I was sleeping in filth, I know I agreed to build the barn and intended to do it, but if you had let me have those shingles I would have done it.' Marvin said, 'I did not promise you any shingles; I am ready to cut the logss tomorrow if you put them on the bed.' John said, 'You will never cut a board for me.' Marvin said, 'I offered you a barn to cure your tobacco in.' * * * Well, when Marvin Mitchum came back to where myself and Mr. Mr. Tom Smith were, he said, 'I have made an agreement with John Mitchum, I will move the packhouse down by the ditch. I am to cut the lumber for John to build the new barn.' John said, 'I have practically framing enough and the tier poles and rafters that I can use, I won't need anything but some weatherboarding.' Marvin Mitchum said, 'I will cut whatever lumber you need to build the barn.' John Mitchum said, 'Go ahead and move it.' * * *

"Q. Now the next conversation that you heard between Marvin Mitchum and Mr. J. H. Mitchum was when? A. In the fall—in October, 1935.  *  *  *

"Q. Will you relate what took place? A. After me and John Mitchum got through talking about the water situation Marvin Mitchum asked John Mitchum 'What are you going to do about this old barn—You have kept me out of the use of my packhouse.' John said, 'I am not going to do anything about it.' Marvin said, 'John, I am ready to carry out my part of the agreement.' John Mitchum said, 'You will never cut another board for me.' Marvin said, 'I don't want to have any trouble.' John Michum said, 'Marvin, I don't want to have nothing more to do with you, because you know how you treated me. When I move that barn twelve men must say I must move it.'

"Q. He did not say he would move it if he gave him the shingles? A. He said he would have built the barn if he had given him the shingles. Marvin said, 'I need those.' "

W. T. Smith was an unwilling witness for plaintiff, but he did finally admit that he had made the following statement to plaintiff's attorney and that it was correct:

"Q.  *  *  *  (Mr. Hinds reading from typewritten statement), and that much of it I dictated and read to you and then asked you to state in your own words, 'Marvin said that he made a proposition to John, and John said that he could use the tier poles and framing out of the barn and the rafters, and Marvin was to saw the balance of the lumber he needed to build another barn whenever John was to tear down the old barn and discontinue to use it.' That is what you said. Is that correct? A. I think it is as well as I remember."

Clyde Cantley testified that he was helping John Mitchum build his residence. He said: "He (John Mitchum) told me that morning that he was going to build a tobacco barn, and he would have enough framing left from his house. He said Marvin Mitchum had promised to saw the lumber for him

free of charge. Would not cost him anything but nails, covering and a little carpenter work."

As against this direct and positive testimony of the making of the contract, alleged by the complaint to have been made, what is the showing for the defense?

The answer itself is evasive, and is largely in the nature of pleas in confession and avoidance. True it denies the making of the alleged contract; then it sets up that he had leased the premises to Mrs. J. R. Joyner, and at the time of the alleged contract this defendant had neither custody nor control of said land or tobacco barn; that plaintiffs had about 200 acres of land upon which they could move the packhouse without material injury to them, while it would be inconvenient and impracticable for this defendant to move his tobacco barn to another point on his premises, and would be to his material injury and damage to a greater extent than the sawing of lumber for a new barn would be compensation for. Further answering, denies that there was any contract between the plaintiffs and himself stating time, place, terms, and conditions and settling all questions arising relative to the moving of the said tobacco packhouse and tobacco barn. Further answering, that if there was a contract as alleged in said complaint, it related to lands, was a parol contract, and void under the statute of frauds.

J. H. Mitchum, the defendant, testified that the packhouse on Marvin Mitchum's land was moved before he knew anything about it. He was not at home that day; was in Kingstree. Denies that he entered into a contract with Marvin Mitchum to the effect that he would move his packhouse and I would move my tobacco barn and build a new one. Never did have a complete agreement, our minds never met, there was some discussion concerning the moving of this barn— it was talked about between the two—he and I never agreed on terms and conditions:

"Some time, probably two weeks before the moving of the packhouse, or probably longer, Mr. Mitchum came to my

gate, I was working in the yard. He spoke and says are you going to build a tobacco barn this year? I said I hadn't planned on one. He said, your barn is rottened down. I said, no, the only things it needs to be made tight. Some of the clay had come out at different times. He said, it did not cure any tobacco last year. I said, no, because there · was no tobacco to be cured. The tobacco in the field took the second growth and I have never been able to· cure in that condition. He left and I walked out to the road with him and had not made him a reply. After I walked out he said, I will go out and move the barn and take out insurance on it. I said what are you going to do· with those shingles. He said, I don't know. I had already told him that I had material to build a new barn out. That the barn could be built of unfinished stuff that I did not want to use in my dwelling. I told him that I would have approximately one-half of the weatherboarding when I got through with my building. He made some state-ment about I could use the inside of the old barn. That is the only indication that he made about the old barn. I says, inasmuch as I have got the material that I have and lack just about one-half of the sawed material, you give me the shingles for the top or roofing, and you can go ahead and move and I will build a new barn. Mr. Mitchum said I have got to build a new shed and do some patching. That is as near the contract that we arrived at as I know anything about it."

J. S. Smith was present when Marvin Mitchum moved the packhouse. Did not see J. H. Mitchum until about 12 o'clock that day.

J. D. Joyner. J. H. Mitchum not there until after pack-house was moved.

J. B. Mitchum. Helped move packhouse. J. H. Mitchum not there that morning.

Ransom Scott, Murray Scott, and Jerry Scott testified that they did not see John Mitchum that morning while the packhouse was being moved.

The record does not disclose that John Mitchum or any of his witnesses deny the significant statements attributed to him by Marvin Mitchum and Gordon Cantley relative to the shingles.

We are entirely satisfied that the Special Referee was correct when he found that there was a contract of the nature of that alleged in the complaint. The positive and circumstantial evidence on the part of the plaintiffs proves it. The evasive, vacillating, and contradictory evidence for the defendant fails to overcome the evidence for plaintiffs. It is significant that John Mitchum nor any of his witnesses denied this evidence given by Gordon Cantley:

"Q. In the fall of 1935 did you have, or hear any conversation of John Mitchum in connection with the matter? A. Yes, sir, I was present when Marvin Mitchum asked John Mitchum what he was going to do about the tobacco barn. * * * Marvin told John, 'John, I want to know what you are going to do about this old barn. You are going to move it as you agreed to?' John said, 'No, I am not, Marvin, I would have gone on and carried out my part of the agreement if you had let me have those shingles—I was balled up in my dwelling. I was sleeping in filth, I know I agreed to built the barn and intended to do it, but if you had let me have those shingles I would have done it.' Marvin said, 'I did not promise you any shingles; I am ready to cut the logs tomorrow if you put them on the bed.' John said, 'You will never cut a board for me.' "

John Mitchum nor any of his witnesses say that Marvin Mitchum agreed to furnish John with shingles. John Mitchum was building a house. He says, "I was balled up in my dwelling. I was sleeping in filth, I know I agreed to build the barn and intended to do it, but (and?) if you had let me have those shingles I would have done it."

That lets the cat out of the bag. It is patent that John agreed to build the barn as plaintiffs testify to the contract; he got balled up in building his house, needed some shingles,

and asked Marvin Mitchum for them, got angry when his request was refused, and retaliated by refusing to carry out his contract.

We can deduce no other reasonable hypothesis from all the evidence.

Plaintiffs' exceptions hereabout must be sustained.

The Special Referee said "the contract is fair; no claim of unfairness was made by the defendant." The defendant did not except to this finding by the Referee; nor did he by his pleadings nor argument before the Referee raise the issue. Nevertheless, the Circuit Judge has held that the contract, 'if proven, is not a fair, just, and equitable one and of such character that a Court of Equity should decree specific performance thereof. The conclusion seems to be predicated upon the assumption that the contract was for the benefit of plaintiffs, that defendant had on hand lumber which he could use to build the barn, and all he was to get out of the contract was to have his lumber sawed by Marvin Mitchum free, at a cost of $16.00 to Marvin Mitchum. This view leaves out of consideration the fact that John Mitchum's barn was old and about useless—certainly it would be necessary to built it over, or build another one in one or two years. He had helpful material on hand and, as he told Clyde Cantley, he had enough framing left from his house; that Marvin had promised to saw the lumber free of charge, would not cost him anything "but nails, covering and a little carpenter work."

Be all this as it may, he made the contract; he never said it was unfair, nor that he was defrauded or overreached in making it.

This Court said in *Philadelphia Storage Battery Co. v. Mutual Tire Stores,* 161 S. C., 487, 159 S. E., 825, 826: "It must be conceded that persons may enter into whatever contracts they see fit, which are not illegal, immoral or against public policy."

It will not be argued that the contract herein under discussion is "illegal, immoral, or against public policy." The defendant does not say so; he said, "I did not keep my agreement because you would not let me have the shingles I wanted."

In the case of *Blassingame v. Greenville County*, 150 S. C., 167, 147 S. E., 848, 862, this Court said: "The rule is nowhere more clearly stated than in *Murrel v. Murrel*, 2 Strob. Eq., 148, 49 Am. Dec., 664; 'A party fully competent to protect himself; under no disability; advised as to all circumstances by which he may be saved in his rights; or in a situation where he might, by due diligence, be so advised; not overreached by fraud, concealment or misrepresentation, nor the victim of a mistake against which prudence might (not?) have guarded; has no right to call upon Courts of justice to protect him against the consequences of his own carelessness, and to disturb the peace of society by his clamors for that justice which he has voluntarily or negligently surrendered' "—citing numerous authorities.

In *Columbus Ry., Power & Light Co. v. Columbus*, 249 U. S., 399, 39 S. Ct., 349, 353, 63 L. Ed., 669, 6 A. L. R., 1648, the Court said:

"If a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail." Citing other authorities.

"It is not the business of courts to protect parties from the consequences of bad contracts, but to protect them from the consequences of either legal or moral fraud." *Jackson v. Carter et al.*, 128 S. C., 79, 121 S. E., 559, 563, citing *Goree v. Wilson*, 1 Bailey, 597.

The findings and conclusions of the Special Referee relative to the application of the statue of frauds to the contract

has not been challenged, and it is not necessary to consider it further.

It is the judgment of this Court that the decree of the Circuit Court be reversed, and the case remanded to that Court, with directions to carry out the findings and conclusions of the report of the Special Referee, as in accord with views herein expressed.

MESSRS. JUSTICES CARTER and BAKER concur.

MR. CHIEF JUSTICE STABLER and MR. JUSTICE FISHBURNE dissent.

MR. CHIEF JUSTICE STABLER (dissenting) : I regret that I am unable to agree with the very strong opinion written by Mr. Justice Bonham. I am satisfied, from a careful reading of all the testimony in this case, that Judge Stoll reached a correct conclusion. For the reasons stated by him, therefore, in his decree, which will be reported, the judgment of the Circuit Court should be affirmed.

MR. JUSTICE FISHBURNE concurs.